IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WAYNE SMITH, JR., | : | |
| **Plaintiff,** | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| TIM CARVER, DALE MEISEL, | : | |
| KELLY ERICH, and PRIMECARE | : | |
| MEDICAL, INC., | : | No. 07-575 |
| **Defendants.** | : | |

**MEMORANDUM AND ORDER**

**Schiller, J.**                                                                    **February 15, 2008**

Plaintiff Wayne Smith brings this civil rights action against Defendants Tim Carver, Dale

Meisel, Kelly Erich, and PrimeCare Medical, Inc. ("PrimeCare").[1]  Plaintiff, who was an inmate at

the Lehigh County Community Corrections Center ("LCCC") and then the Lehigh County Prison

("LCP"), asserts that Defendants violated his Constitutional right to be free from cruel and unusual

punishment by failing to provide him with adequate medical care.  Plaintiff asserts a claim pursuant

to 42 U.S.C. § 1983 and a Pennsylvania state law negligence claim against all Defendants.  Presently

before the Court are all Defendants' motions for summary judgment as to all of Plaintiff's claims.

For the reasons set forth below, Defendants' motions are granted, and all claims are dismissed.[2]

---

[1] Plaintiff does not oppose the granting of summary judgment to individual Defendant
Kelly Erich, and thus Defendant Erich's motion will be granted.  (Pl.'s Mem. of Law in Opp'n to
Defs.' Erich and PrimeCare's Mot. for Summ. J. [hereinafter Pl's. Resp. to PrimeCare Mem.] at
1.)

[2] Defendants Tim Carver and Dale Meisel assert a cross-claim against Defendants
PrimeCare and Erich sounding in indemnification.  Because the underlying claims against
Defendants Carver and Meisel are dismissed, there is no basis for liability against them, and their
cross-claim is dismissed as moot.

1

I.    BACKGROUND

Throughout the relevant time period, Plaintiff was an inmate at the LCCC, a work release facility located in Lehigh County, Pennsylvania, and then later at the LCP, a prison in Lehigh County.  (Defs.' Carver & Meisel Mot. for Summ. J. [hereinafter Carver Mot.] Ex. 1 (Smith Dep.) at 40-41.)  Upon entering the LCCC, Plaintiff signed a health care waiver.  (Carver Mot. Ex. 2 (Health Care Waiver).)  The waiver provides that due to undue risk of injury or illness to participants while on work release, as well as prohibitive cost, it is "not possible for the County of Lehigh to provide medical care and/or medical care insurance coverage for participants in the Community Corrections Center Program."  (*Id.*)  Thus, as a condition of participating in work release, Plaintiff "assume[d] sole, full, and complete financial responsibility for any and all medical expenses incurred while in the Program."  (*Id.*)  While at the LCCC, inmates are permitted to leave the facility via their own transportation to see their personal physicians, to maintain their own prescription medications, and to get monthly refills at a local pharmacy.  (Carver Mot. Ex. 3 (Carver Dep.) at 22 & Ex. 1 at 16-18, 41-42, 44-48.)

Prior to entering the prison system, Plaintiff was under the psychiatric care of Dr. John Mitchell for Attention Deficit Hyperactivity Disorder ("ADHD"), anxiety, depression, and Restless Leg Syndrome ("RLS"). (Carver Mot. Ex. 1 at 10-12.)  When he entered the LCCC in October 2006, Plaintiff was taking Adderall for ADHD, Neurontin and Restoril for RLS, Lamictal for depression, and Celexa for anxiety and depression. (*Id.* at 12-16.)  Pursuant to the LCCC's policies, Plaintiff drove in his own vehicle to his monthly appointments with Dr. Mitchell and refilled his prescriptions at the local CVS.  (Carver Mot. Ex. 1 at 44-46.)  Plaintiff believes that he refilled his Restoril prescription twice while at the LCCC.  (*Id.* at 45-46.)

Accepting as true Plaintiff's sworn deposition testimony, Plaintiff ran out of Restoril on December 18, 2006. (*Id.* at 47-48.) Plaintiff submitted multiple written requests for a refill to LCCC employee Kirk Eichman on December 18; Plaintiff believes Eichman did not respond because he was on vacation. (*Id.* at 51; 53.) Plaintiff admits that when he did not hear back from Eichman immediately, he did not speak with any LCCC employee or supervisor about his need to obtain a refill. (*Id.* at 54.) On December 20, 2006, Plaintiff was permitted to leave the LCCC to get his Restoril refill at CVS, which his time card indicates he did at 10:00 a.m. (Carver Mot. Ex. 3 at 11-15.)

Meanwhile, at approximately 12:30 a.m. on December 20, 2006, Plaintiff was having difficulty sleeping because he was suffering from leg pain due to his RLS. (Carver Mot. Ex. 1 at 21-22.) Plaintiff believes that he suffered this RLS attack because he was unable to take his Restoril on the evening of December 19, 2006. (*Id.*) Seeking relief from the pain, Plaintiff attempted to descend from his top bunk bed, but fell to the ground, hitting his lower back and head on another bunk bed. (*Id.* at 22-25.) At 2:46 a.m., Plaintiff was transported by ambulance from the LCCC to St. Luke's Hospital, where he was diagnosed as suffering from a pulled muscle and given Demerol for the pain. (*Id.* at 26; Carver Mot. Ex. 3 at 13-14.) Plaintiff was not accompanied in the ambulance or at the hospital by any prison officials. (*Id.*)

At approximately 6:00 a.m. on December 20, 2006, Plaintiff was released from the Hospital and called his wife three times, seeking a ride back to the LCCC. (*Id.* at 59-60.) Believing his wife was asleep because she did not answer either her home telephone or cell phone, and without cab fare or any friends in the area to call, Plaintiff called the LCCC and asked for transportation back to the facility. (*Id.* at 59.) The LCCC employee on the other end of the line, believed by Plaintiff to be

Corrections Officer Henning, reportedly told Plaintiff, "you got there on your own, get back on your own." (*Id.*) Believing that he had exhausted his options, Plaintiff walked 2.7 miles back to the LCCC without protective winter clothing and under the influence of a sedative. (*Id.* at 60-61.) Plaintiff arrived at the LCCC at 8:37 a.m. (Carver Mot. Ex. 3 at 14.)

Following his return to the LCCC on December 20, 2006, Plaintiff began experiencing pain in his head and ear. (Carver Mot. Ex. 1 at 71.) On the afternoon and evening of December 22, 2006, Plaintiff asked first and second shift corrections officers for permission to return to St. Luke's Hospital. (*Id.* at 72.) The officers offered to take Plaintiff to the doctors at the nearby LCP for treatment, but Plaintiff refused, believing he would get better treatment at St. Luke's. (*Id.* at 70-74.) In the early hours of December 23, 2006, Plaintiff made the same request to the third shift corrections officer. (*Id.* at 76-77.) The officer called Tim Carver, the LCCC warden, at his home; Carver gave Plaintiff permission to go to St. Luke's via his own transportation. (*Id.*) Plaintiff's wife, who was working a night shift at the time Plaintiff received permission to leave, drove him back to St. Luke's at 7:44 a.m. (*Id.*) Plaintiff was treated at St. Luke's and returned to the LCCC at 10:26 a.m. (Carver Mot. Ex. 5 (Smith time card).)

Sometime on December 23, 2006 Corrections Officer Decker wrote an incident report detailing Plaintiff's requests to go back to St. Luke's Hospital. (Carver Mot. Ex. 6 (Incident Report).) Decker wrote, "I feel if his condition was that bad he would have made more effort to go earlier. I feel he is playing the system. It may be best if he goes uptown, where he would have his care." (*Id.*) Three days later, Plaintiff was asked to give a urine sample pursuant to the LCCC's routine drug testing policy. (Carver Mot. Ex. 1 at 62.) Plaintiff was given two hours to produce a sample and was provided with water. (*Id.* at 66.) Under the policy, if an individual fails to produce

a sample, he is considered to have failed the test and is transferred out of the work release program and into the state prison facility.  (*Id.*)  Plaintiff failed to produce a sample in the requisite time frame; he was thus transported to the LCP, where he remained until his release from the prison system on April 27, 2007.  (*Id.* at 61-70.)

Because the LCP is a prison rather than a work release facility, inmates are not permitted to leave the facility to see their own doctors or maintain their own prescriptions; rather, the LCP contracts with Defendant PrimeCare to provide on-site medical services.  (Defs.' PrimeCare & Erich's Mot. for Summ. J. [hereinafter PrimeCare Mot.] Ex. F (Pharmaceuticals Policy) at 6.) PrimeCare has been accredited by the National Commission on Correctional Health Care for the entire time it has provided medical services at the LCP.  (Carver Mot. Ex. 7 (Meisel Dep.) at 35-38.) Defendant Dale Meisel, the warden of the LCP, is not directly involved in the provision of medical care to inmates.  (Carver Mot. Ex. 7 at 29-31.)

PrimeCare's Pharmaceutical Policy instructs that "medications brought into the facility from the outside by a patient shall be reviewed by a PCM physician, and a decision will be made whether to authorize the use of the medication."  (Pl.'s Resp. to PrimeCare Mot. Ex. F at 6.)  PrimeCare uses a drug formulary—a list of pharmaceuticals—and recommends that physicians follow it in order to ensure cost effectiveness and the availability of medications.  (*Id.*)  However, physicians are not prohibited from prescribing medications not in the formulary if they have permission from the supervising physician at the LCP and the corporate office.  (Pl.'s Resp. to PrimeCare Mot. Ex. C (Thomas Dep.) at 33-36.)

Upon entry to the LCP, Plaintiff was seen by Dr. Alex Thomas, a licensed psychiatrist who consults at forty prisons.  (Pl.'s Resp. to PrimeCare Mot. Ex. C at 6-9.)  On December 26, 2006, Dr.

Thomas prescribed Prozac in lieu of the Adderall, Celexa and Lamictal. (*Id.* at 13-28.)  Dr. Thomas

testified that he does not prescribe Adderall in prisons because it is often abused by inmates.  (*Id.*)

He prescribed Atarax to replace Plaintiff's Neurontin and Restoril.  (*Id.*)  On December 27, 2006,

when Plaintiff reported withdrawal symptoms, Dr. Thomas prescribed Klonopin in addition to his

previous prescriptions.  (*Id.*)  On January 5, 2007, a PrimeCare physician's assistant prescribed

Depakote for Plaintiff's continuing RLS symptoms. (*Id.* at 32-33.)   Plaintiff was never prescribed

Restoril by a PrimeCare physician, despite his requests for "something similar to [his] medication

outside" for leg pain.   (Pl.'s Resp. to PrimeCare Mot. Ex. G (Sick Call Request).)   While

incarcerated at the LCP, Plaintiff received these substitute medications every day. (Carver Mot. Ex.

1 at 31.)  Plaintiff never filed a formal grievance regarding his medical care at the LCP.  (Pl.'s Resp.

to PrimeCare Mot. Ex. C at 46-53.)


## II.      STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a

dispute of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV.

P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  When the moving party

does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by

showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).   Thereafter, the nonmoving party

demonstrates a genuine issue of material fact if sufficient evidence is provided to allow a reasonable

finder of fact to find for the nonmoving party at trial.  *Anderson*, 477 U.S. at 248.  In reviewing the

record, "a court must view the facts in the light most favorable to the nonmoving party and draw all

inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). Furthermore, a court may not make credibility determinations or weigh the evidence in making its determination. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S.133,150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III.   DISCUSSION

### A.   Plaintiff Fails to Establish his Section 1983 Claims

Plaintiff brings a Section 1983 claim against Defendants Tim Carver, the warden of the LCCC, PrimeCare, the medical services provider at the LCP, and Dale Meisel, the warden of the LCP, alleging that their failure to ensure that he be provided medical care violates the Eighth Amendment ban on cruel and unusual punishment. To establish a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate a violation of a right protected by the Constitution or the laws of the United States committed by a person acting under the color of state law. *Natale v. Camden County Correctional Facility*, 318 F.3d 575 (3d Cir. 2003) (*citing Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000)). While Plaintiff's Complaint alleges his Section 1983 claim against all Defendants, it is undisputed that Defendant Carver's involvement in the case ended when Plaintiff was transferred to the LCP. Likewise, Defendants PrimeCare and Meisel did not interact with Plaintiff until his transfer. Because Plaintiff brings his claims against the individual Defendants in their official capacity, they are analyzed under a two-step inquiry. First, Plaintiff must establish a constitutionally cognizable injury under the Eighth Amendment. If he does so, he must then establish supervisory liability.

Eighth Amendment-based Section 1983 claims sounding in inadequate medical care are

difficult to establish.  Inadequate medical care rises to the Eighth Amendment level only when a

plaintiff can show both a serious medical need and acts or omissions by prison officials that indicate

deliberate indifference to that need.  *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).  Not every prisoner

complaint of inadequate medical care rises to the level of a Constitutional violation.  *White v.

Napoleon*, 897 F.2d 103, 108-09 (3d Cir. 1990).  Indeed, claims of medical malpractice cannot give

rise to a violation of the Eighth Amendment—"neglect, carelessness or malpractice is more properly

the subject of a tort action in the state court."  *Unterberg v. Correctional Medical Systems, Inc.*, 799

F. Supp. 490, 497 (E.D. Pa. 1992).

At the outset, Plaintiff has established a sufficiently "serious medical need" through his

undisputed testimony that his ADHD, anxiety, depression, and RLS were "diagnosed by a physician

as requiring treatment."  *Atkinson v. Taylor*, 316 F.3d 257, 272-73 (3d Cir. 2003).  In order to

establish an Eighth Amendment injury, then, he must prove that Defendants Carver, PrimeCare, and

Meisel were deliberately indifferent to his medical need.  The deliberate indifference standard in this

context is subjective, requiring actual knowledge of his serious medical need.  *Farmers v. Brennan*,

511 U.S. 825, 846 (1994).

Even if Plaintiff can prove an Eighth Amendment inquiry, he must also prove supervisory

liability for that injury because he has brought his claims against Defendants Carver and Meisel in

their official capacity.  A supervisory official may not be held liable under Section 1983 for actions

of their subordinates pursuant to *respondeat superior*. *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir.

2005).  Rather, a supervisor may be held liable only if he was "personally involved" in the alleged

wrongdoing.  *Id.*  In order to prove personally involvement, Plaintiff must meet the requirements of

a four-prong test.  As an initial matter, Plaintiff must identify a "specific policy or practice that the

supervisor failed to employ." *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989).  It is insufficient to simply allege that the constitutional violation would not have occurred if the supervisor had "done more than he or she did." *Id.*

Once Plaintiff identifies specifically what the supervisor failed to do, he must prove: (1) that the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) that the supervisor was aware that the unreasonable risk was created; (3) that the supervisor was indifferent to that risk; and (4) that the injury resulted from the policy or practice.  *Beers-Capitol v. Whetzel*, 256 F.3d 120, 134 (3d Cir. 2001) (*citing Sample*, 885 F.2d at 1118).  A plaintiff may prove a supervisor's actual knowledge of the risk by showing that the supervisor failed to adequately respond to a pattern of past occurrences of like injuries or by showing that the risk of constitutionally cognizable harm was "so great and so obvious" that the risk and the failure of supervisory officials to respond will alone support finding a genuine issue of material fact.  *Id.* at 136-7 (*citing Sample*, 885 F.2d at 1118).

1. *Plaintiff fails to establish a Section 1983 claim against Defendant Carver*

a. *Plaintiff cannot prove supervisory liability for a failure to respond to Plaintiff's requests to refill his Restoril prescription on December 18-19, 2006*

Plaintiff's first allegation of an Eighth Amendment injury stems from his claim that he was unable to refill his Restoril prescription on December 18, 2006 or December 19, 2006.  Plaintiff alleges that despite his requests on those days, he was not given permission to leave the LCCC to obtain his refill.  As a result of not taking Restoril on December 19, Plaintiff suffered an RLS attack, which caused him to fall out of bed, setting into motion the chain of events that are the basis for his other claims.  Officials at the LCCC permitted Plaintiff to get his refill only after he returned from

9

the hospital on December 20, 2006.

Yet even if Plaintiff could theoretically prove that certain prison officials' denials or ignorance of his requests constitute deliberate indifference to a serious medical need, Plaintiff fails to present sufficient evidence to establish supervisory liability as to Defendant Carver. As a preliminary matter, Plaintiff makes no attempt whatsoever to meet the *Sample* requirements; he does not point to any specific policy or practice that the supervisor failed to employ. *Sample*, 885 F.2d at 1118. Neither does he present any evidence that any potentially relevant practice, such as granting corrections officers or counselors the authority to approve or deny refill requests, creates an unreasonable risk of Eighth Amendment injury. *Id.* Plaintiff identifies no prior pattern of like injuries or that Plaintiff's immediate need for a Restoril refill was "so great and so obvious" that Carver's failure to respond would alone support finding a genuine issue of material fact. *Beers-Capitol*, 256 F.3d at 136-7. In fact, the only evidence Plaintiff points to support his claim that Carver had actual knowledge of Plaintiff's need for a refill is Carver's testimony that Plaintiff refilled his prescription on December 20, 2006. (Pl.'s Brief in Supp. of Resp. in Opp'n to Defs.' Carver & Meisel Mot. for Summ. J. [hereinafter Pl.'s Resp. to Carver Brief] at 14 (*citing* Carver Mot. Ex. 3 at 15).) Simply put, Plaintiff has presented no evidence that Carver was aware of Plaintiff's need for a refill before that date. Without actual knowledge, Plaintiff's claim necessarily fails. *Farmers*, 511 U.S. at 846.

> b.   *LCCC's refusal to transport Plaintiff from St. Luke's Hospital back to the LCCC is not an Eighth Amendment violation*

Plaintiff next alleges that the LCCC's refusal to transport him from St. Luke's Hospital back to the LCCC, which caused him to walk 2.7 miles without protective clothing and under heavy

sedation, amounts to an Eighth Amendment violation.  While Plaintiff undoubtedly suffered as a result of this walk, and while Correction Officer Henning's alleged statement that "you got there on your own, get back on your own" may be unprofessional or impolite, Plaintiff has not proven any violation of his rights under the Eighth Amendment.

Pursuant to the LCCC's policies, of which Plaintiff was aware, the LCCC was under no obligation to provide Plaintiff with transportation.  As a participant at the LCCC, a work release program, Plaintiff was permitted to drive his own vehicle, which he admits he did to go to his doctor's appointments and to obtain his refills.  Further, he traveled to the hospital in an ambulance on December 20, 2006 without supervision, as a private citizen.  He also acknowledges that when he needed to return to the LCCC on December 20, 2006, he called his wife three times in search of a ride before he contacted the LCCC.  He has not proven that LCCC was required to provide him with medical transportation, and thus he has not suffered a constitutionally cognizable injury.

Even if Plaintiff had established a constitutional violation, he again makes no effort to establish Carver's supervisory liability.  Again, Plaintiff fails to identify a policy or practice as required by *Sample*.  The only evidence submitted by Plaintiff to establish Carver's awareness of the situation is that Carver received a report on December 20, 2006 when he arrived at the LCCC at 8:37 a.m. describing the events the previous evening.  Plaintiff argues that "a fact-finder could clearly infer that Defendant Carver knew about the emergency the night before upon his arrival, as at the time of his arrival at the facility the Plaintiff had not yet returned from St. Luke's but had called stating [sic] needed a ride back." (Pl.'s Resp. to Carver Brief at 15.)  Plaintiff provides no evidence to support this leap of faith.  Without any evidence that Carver had actual knowledge of Plaintiff's request for transportation, supervisory liability is inappropriate.  *Farmers*, 511 U.S. at 846.

> c.    *Plaintiff cannot establish an Eighth Amendment violation for the delay between his first request to return to St. Luke's Hospital and his actual return*

Neither can Plaintiff establish an Eighth Amendment injury for the delay between his first request to return to St. Luke's Hospital on December 22, 2006 and his actual return the following morning. It is well established that "mere disagreements over medical judgment do not state Eighth Amendment claims." *White*, 897 F.2d at 109. Plaintiff acknowledges that when he asked first and second shift corrections officers for permission to return to St. Luke's Hospital on December 22, 2007, they offered to take him to the on-call physician at the LCP. He also admits that the third shift officer called Carver on the telephone, Carver allowed him to return to St. Luke's Hospital, and that he did indeed return. The Eighth Amendment proscription against cruel and unusual punishment requires prisons to provide inmates with adequate medical care, not the best medical care or the particular medical care of the inmate's choosing. *Estelle v. Gamble*, 429 U.S. 97, 104-5 (1976). Plaintiff has submitted no evidence that the LCP physician would not have provided adequate care; he simply preferred to go back to the hospital. This is insufficient to keep his claim alive.

Plaintiff appears to suggest that a second Eighth Amendment injury arises from the nearly eight hour time span between the telephone call in which Carver granted Plaintiff permission to return to St. Luke's Hospital and his actual return. This time span is unavailing, as Plaintiff admits that the reason for the delay was that his wife was working the third shift, and picked him up from the LCCC at 7:44 a.m. after she finished working. Again, Plaintiff fails to identify any policy or practice that Carver failed to employ, any risk of constitutional harm, or any actual knowledge on Carver's part of his initial requests to return to the hospital. He has failed to raise a genuine issue of material fact as to either a constitutionally cognizable injury or supervisory liability.

        *d.*       *Plaintiff cannot establish a constitutional violation for being asked to give a urine sample in accordance with the LCCC policy*

Finally, Plaintiff alleges that he was retaliated against by the LCCC corrections officers when he was asked to provide a urine sample on December 26, 2006.  Plaintiff theorizes that the officers knew that Plaintiff was on prescription pain killers following his fall, and thus attempted to get a urine sample from him when they knew it might come back "hot," or positive.  (Pl.'s Resp. to Carver Brief at 17-18.)  As further evidence of retaliation, Plaintiff points to the incident report in which Officer Decker stated that he thinks Plaintiff was "playing the system" and that "it may be best if he goes uptown, where he would have his care."  (Pl.'s Resp. to Carver Brief at 18 (*citing* Carver Mot. Ex. 6).)

It is unclear whether Plaintiff is alleging an Eighth Amendment or Fourteenth Amendment violation here, as he cites to no law whatsoever, but neither is borne out.  Under no circumstances can Plaintiff establish that being asked to provide a routine urine sample, in accordance with the standard drug testing policy at the LCCC, is cruel and unusual punishment.  Neither can he establish a violation of a supposed Fourteenth Amendment liberty interest in remaining in the work release facility, where he was relatively free to leave and to work, rather than the LCP.  Prisoners in work release programs do not have an unfettered right to remain so situated; rather, the Fourteenth Amendment is implicated only when prison officials place an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see also Griffin v. Vaughn*, 112 F.3d 703, 706 (3d Cir. 1977).  "[T]he baseline for determining what is 'atypical and significant' . . . is ascertained by what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process

of law." *Id.*

Plaintiff admits that a condition of his status at the LCCC was that he would have to give periodic urine samples, he admits that the LCCC policy is that a failure to produce a sample in two hours amounts to a failure of the test and transfer to the LCP, and he admits that he failed to produce such a sample. (Carver Mot. Ex. 1 at 62-70.) Plaintiff thus has no argument that his transfer to the LCP would not have been reasonably expected. *Griffin*, 112 F.3d at 706. Neither, again, does he state any claim that Carver had any involvement with selecting him for the urine sample, so his claim necessarily fails.

> 2. *Plaintiff fails to establish a Section 1983 claim against Defendants PrimeCare or Meisel*

Plaintiff's Section 1983 claims against Defendant PrimeCare and Defendant Meisel are based on his disagreement with his PrimeCare physician over which medications he should receive. As an entity, Defendant PrimeCare "cannot be held responsible for the acts of its employees under a theory of *respondeat superior* or vicarious liability." *Natale v. Camden County Correctional Facility*, 318 F.3d 575, 586-84 (3d Cir. 2003). Rather, Plaintiff must "provide evidence that there was a relevant [medical services] provider policy or custom, and that the policy [or custom] caused the Constitutional violation" alleged by Plaintiff. *Id.* Plaintiff's allegation of Defendant Meisel's supervisory liability (over PrimeCare, as warden of the LCP) is analyzed under the same framework as Plaintiff's claim against Defendant Carver.

> a. *Plaintiff's disagreement with Defendant PrimeCare over the type of medication he should be prescribed does not establish an Eighth Amendment violation*

Plaintiff alleges that PrimeCare is liable under Section 1983 for its physicians' failure to

prescribe Plaintiff Restoril despite his multiple requests, causing Plaintiff unnecessary pain and withdrawal symptoms. As described *supra* with regard to Plaintiff's desire to return to St. Luke's Hospital rather than the on-call physician at the LCP, an inmate is entitled only to legally adequate medical care, and his disagreements over medical judgment do not create Eighth Amendment claims. *Estelle*, 429 U.S. at 97; *White*, 897 F.2d at 109. Specifically, disagreements as to whether an inmate should receive one prescription rather than another do not give rise to Constitutional injury. *White*, 897 F.2d at 108-11 ("By itself, Dr. Napolean's decision to give [plaintiff] Dilantin instead of Epitol is not actionable"); *see also Phillips v. Jasper County Jail*, 437 F.3d 791, 795 (8th Cir. 2006) ("The fact that [plaintiff] disagreed with [defendant physician] as to the proper anti-seizure drug . . . does not establish deliberate indifference."); *Hauber v. New Jersey Dept. of Corrections*, Civ. A. No. 06-1418, 2006 WL 2241611, at *6 (D.N.J. Aug. 3, 2006) ("[Plaintiff's] dissatisfaction with the type of treatment he is receiving [Zantac instead of Prevacid] does not suggest deliberate indifference by defendants."). Plaintiff admits that he was prescribed medications by Dr. Thomas his first day at the LCP, he admits that he was prescribed additional medication when he returned the next day complaining of withdrawal symptoms, and he admits that he received prescription medications every day that he was incarcerated at the LCP. *See Unterberg*, 799 F. Supp. at 495 (granting summary judgment for defendant when "[plaintiff] was provided with medical care on each and every day she was incarcerated"). His disagreement with Dr. Thomas, therefore, does not state a Constitutional injury.[3]

---

[3] Plaintiff's own reliance on *White* is misplaced. While the Court in *White* found that the plaintiff stated a claim for a violation of the Eighth Amendment, its holding was based on evidence that the doctor in that case *intended* to inflict pain on prisoners. *White*, 897 F.2d at 110-11 (emphasis added). The Court repeatedly emphasized that without such intent, Plaintiff would state a claim only for malpractice. *Id.* at 110. Plaintiff has presented no evidence that Dr.

Even if Plaintiff were to establish an Eighth Amendment injury, his argument that PrimeCare had a custom that caused his injury falls far short of the legal requirements for entity liability. "A custom is an act 'that has not been formally approved by an appropriate decision maker,' but that is 'so widespread as to have the force of law.'" *Natale*, 318 F.3d at 584 (*citing Bd. of County Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 404 (1997)).  While Plaintiff boldly asserts that PrimeCare "has a clear custom of denying inmates medications that were not on its drug formulary, regardless of the inmates' needs," he provides not a single past occurrence to support this bald allegation. (Pl.'s PrimeCare Mem. at 2.)  Clearly then, he has failed to prove that this custom is "so widespread as to have the force of law." *Natale*, 318 F.3d at 584.

While Plaintiff states that his argument rests on custom, he also points to an alleged PrimeCare policy that requires physicians to prescribe only those drugs that are on their formulary, without exception.  In support of his position, Plaintiff points to PrimeCare's Pharmaceutical Policy, which states that "PCM requires adherence by all medical staff to the established drug formulary." (Pl.'s PrimeCare Mem. at 2 (*citing* Pl.'s Resp. to PrimeCare Mot. Ex. F at 1).)  Further, Plaintiff alleges that PrimeCare's Health Services Administrator Josie Bahnick "admitted that PrimeCare will not permit inmates to take prescriptions unless they are on Defendant's formulary, regardless of need." (*Id.*)

Plaintiff's allegations seriously distort the record.  The PrimeCare policy referenced by Plaintiff explicitly states, "choice of medications should be limited to those contained in the formulary *except when suitable alternatives do not exist*." (Pl.'s Resp. to PrimeCare Mot. Ex. F at 5.) (emphasis added).  Ms. Bahnick's testimony, as cited by Plaintiff, is that "the doctor goes over

_____

Thomas intended to cause him pain.

16

the prescriptions and *if there's something comparable*, he puts him on one of the formulary drugs."

(Pl.'s Resp. to PrimeCare Mot. Ex. D (Bahnick Dep.) at 13.) (emphasis added).  Dr. Thomas testified

that he has prescribed medications that are not on the formulary.  (Pl.'s Resp. to PrimeCare Mot. Ex.

C at 34.)  Plaintiff thus proves neither a custom nor a policy that would subject PrimeCare to entity

liability.

> b.     *Without establishing an underlying Eighth Amendment violation,*
> *Plaintiff cannot establish supervisory liability for Defendant Meisel*

Because Plaintiff has failed to establish that he suffered a Constitutional injury at the LCP,

he has no claim against its warden, Defendant Dale Meisel, for supervisory liability.  Furthermore,

"absent a reason to believe (or actual knowledge) that prison doctors or their assistants are

mistreating (or not treating) a prisoner, a non-medical prison official [such as Meisel] . . . will not

be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Spruill*

*v. Gills*, 372 F.3d 218, 236 (3d Cir. 2004).  Plaintiff admits that beyond submitting Sick Call

Requests to PrimeCare, he never filed an official grievance in accordance with the LCP's policies

and never brought his complaints to Meisel.  As with Defendant Carver, without proof of actual

knowledge, Plaintiff has no claim of Section 1983 supervisory liability against Defendant Meisel.

*Farmers*, 511 U.S. at 846.

Having failed to make out a single Section 1983 claim, all Defendants' motions for summary

judgment as to those claims are granted, and the Section 1983 claims are dismissed.

**B.     The Court Declines to Extend Supplemental Jurisdiction to Plaintiff's State**
**Law Claim**

A district court has the discretion over whether to extend supplemental jurisdiction to state

law claims when no federal claims remain in the case.  28 U.S.C. § 1367(c)(3) (2008) ("The district

courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has

dismissed all claims over which it has original jurisdiction."); *see also Queen City Pizza v. Domino's*

*Pizza*, 124 F.3d 430, 433 (3d Cir. 1997) (the decision to decline supplemental jurisdiction over a

plaintiff's remaining state law claims "is committed to the sound discretion of the district court").

Because Plaintiff's Section 1983 claim is dismissed, the Court finds that his state law

negligence claim is more appropriately adjudicated in Pennsylvania state court. Thus, the state law

claim is dismissed without prejudice, to be re-filed by Plaintiff in state court if he so chooses.[4]

## IV.    CONCLUSION

For the foregoing reasons, the Court grants summary judgment to Defendants Tim Carver,

PrimeCare, Inc., and Dale Meisel and dismisses all claims.[5]  An appropriate Order follows.

---

[4] Federal law provides that the statue of limitations for any such claim shall be tolled while the claim is pending in the federal courts and for a period of 30 days after it is dismissed, unless State law provides for a longer tolling period.  28 U.S.C. § 1367(d) (2008).

[5] Plaintiff's January 31, 2008 request to join certain individual corrections officers as additional defendants—less than one month before the trial date, when he has been aware of their identities since December 12, 2007—is denied. *Hill v. City of Scranton*, 411 F.3d 118, 134 (3d Cir. 2005).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WAYNE SMITH, JR.,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **TIM CARVER, DALE MEISEL,** | : | |
| **KELLY ERICH, and PRIMECARE** | : | |
| **MEDICAL, INC.,** | : | **No. 07-575** |
| **Defendants.** | : | |

### ORDER

**AND NOW**, this **15th** day of **February**, **2008**, upon consideration of Defendants' motions for summary judgment, Plaintiff's responses thereto, and for the foregoing reasons, it is hereby **ORDERED** that:

1.  Defendants Tim Carver and Dale Meisel's Motion for Summary Judgment (Document No. 31) is **GRANTED**.

2.  Defendants Kelly Erich and PrimeCare Medical, Inc.'s Motion for Summary Judgment (Document No. 32) is **GRANTED**.

3.  The Clerk of Court is directed to close this case.

BY THE COURT:

_____

**Berle M. Schiller, J.**